**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MYRTLE WILSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06 C 5840 |
| | ) | |
| HARRIS N.A., | ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Myrtle Wilson maintains a checking account with Defendant Harris N.A. ("Harris Bank"). In October 2005, Wilson complained to Harris Bank that fifteen allegedly unauthorized transactions had diminished the balance in her checking account. Harris Bank's subsequent investigation into Wilson's complaint (or lack thereof) is the basis for this action. Wilson claims that, in the aftermath of her complaint, Harris Bank violated provisions of the Electronic Funds Transfer Funds Act ("EFTA"), 15 U.S.C. § 1693 *et seq.;* the Illinois Consumer Fraud and Deceptive Practices Act ("ICFA"), 815 ILCS 505/1 *et seq.*; and § 407(a) of the Social Security Act. Harris Bank has moved to dismiss all but one of Wilson's claims for failure to state a claim. For the reasons explained below, Harris Bank's motion to dismiss is granted in part and denied in part.

## BACKGROUND

### A. Harris Bank's Investigation of the Allegedly Unauthorized Transactions

On October 12, 2005, Myrtle Wilson visited two different ATM machines and attempted to withdraw money from her Harris Bank checking account using her Harris Bank debit card. (Compl. ¶ 5.) Both transactions were declined. (*Id.*) Later that day, when Wilson called Harris Bank to ask why her debit card had been declined, a bank employee explained that her checking account was overdrawn. (*Id.* ¶ 6.) On October 13, 2005, Wilson visited a Harris Bank branch and learned that her account had been diminished by fifteen unauthorized transactions. (*Id.* ¶ 7.) Thirteen of these

were debit card transactions executed on October 7, 2005 and October 11 and 12, 2005; five of the debit card transactions occurred at "Food 4 Less," seven occurred at "Sam's Gas," and one at "Marathon." (*Id.*) Two of the transactions were "forced checks" dated October 14, 2005.[1] (*Id.*) Together, these transactions diminished Wilson's account by $1,111.67. (*Id.*) In response to this information, Wilson executed three affidavits stating that she had not authorized the merchant transactions. She also notified Harris Bank of the two "forced checks." (*Id.* ¶ 8.) In addition, Wilson filed a report with the Chicago Police Department. (*Id.* ¶ 9.) On that same day, October 13, Wilson faxed the affidavits and the police report to the Bank's ATM Adjustment Processing Unit so that it could begin investigating the transactions.[2] (*Id.* ¶ 10.)

In a letter dated October 28, 2005, Harris Bank advised Wilson that it was denying her claim. (*Id.* ¶ 11.) The unsigned letter, a copy of which is attached to Defendant's motion to dismiss, did not state the reason for the denial, did not describe the nature of the investigation, and did not indicate when the Bank's investigation was completed. (10/28/05 Letter, Ex. A to Harris N.A.'s Motion to Dismiss Pursuant to Rule 12(b)(6) ("Def. Mot.").) Shortly thereafter, Wilson requested that the Bank send her the documents it relied upon in making this determination. (Compl. ¶ 12.) Harris Bank employee Anna Chavez called Wilson on December 1, 2005 and promised to send her the requested documents. (*Id.*) The Bank did not in fact do so until May 2006. On May 9, 2006, Stacy Bond of the Harris Bank sent Wilson's attorney a letter[3] explaining that Wilson's claim was denied because all of the transactions at issue required both Wilson's ATM card and PIN number; as

---

[1] Neither party explains what Plaintiff means by "forced check." Because this expression appears more than once in the complaint, the court presumes that "forced" is not a misspelling of "forged" and that it may instead mean "post-dated."

[2] Wilson has not explained why she executed three affidavits; perhaps there was one such affidavit for each of the three merchants involved in the unauthorized transactions.

[3] The letter dated May 9, 2006 states that it is in response responding to a letter sent on April 7, 2006 by Wilson's attorney. (5/9/06 Letter, Ex. B. to Def. Mot.) The parties have provided no information about the April 7, 2006 letter.

Wilson had "repeatedly stated" that she was the only person who had access to her ATM card and PIN number during the relevant time period, the Bank concluded that Wilson must have authorized the transactions in question. (*Id.* ¶ 13; 5/9/06 Letter, Ex. B. to Def. Mot.) This letter also noted that there was no evidence to suggest that a "sophisticated scam of some sort caused the unauthorized disclosure of Ms. Wilson's PIN or debit card number." (5/9/06 Letter.)

**B.      Harris Bank's Compliance with U.S. Department of Treasury Advisory Letter**

Wilson alleges that the Bank's investigation did not follow the directives contained in an advisory letter issued by the U.S. Department of the Treasury, Office of the Comptroller of the Currency ("OCC") in September of 2001. (Compl. ¶¶ 14-19.) This letter "promulgated actions a financial institution should take to ensure its investigations comply with the bank's EFTA obligations," and expressed concern that "some banks may be rejecting claims of unauthorized transactions solely because the customer's [ATM] card or debit card and [PIN] number were used in the transaction, and the customer supplied no information indicating that the card or PIN was misplaced." (*Id.* ¶¶ 14-15.) The letter informed banks that they "must take steps to investigate whether there are indications that unauthorized use occurred," (OCC Advisory Letter, Ex. D. to Def. Mot.), and set forth the following factors that a bank might consider in making a reasonable investigation:

- Documentation or written, signed statements provided by the customer.
- Historical information on the customer's pattern of use (e.g., time, frequency, location, and types and amounts of transactions).
- Location of the transaction in relation to the customer's residence, place of business, or normal shopping locations.
- Customer's location at the time of the unauthorized transaction.
- Problems reported by other customers regarding the access device or ATM.
- Signature information on point of sale transactions.
- Police reports, if available.
- Film from security cameras, if available.

(Compl. ¶ 16; OCC Advisory Letter, at 2.)

Wilson asserts that the explanation provided by Harris Bank on May 9, 2006 shows that the

Bank did not inquire into Wilson's pattern of use, did not view relevant security camera footage, and did not consider her whereabouts at the time of the transactions. (*Id.* ¶¶ 17-19.) Had the Bank conducted such an investigation, Wilson alleges, it would have discovered that Wilson is eighty years old and wheelchair-bound, and that she had only used her debit card in the past for ATM withdrawals, not for consumer purchases like the transactions at issue. (*Id.* ¶ 17.) Moreover, Wilson alleges, in an appropriate investigation the Bank would have discovered that she had never used her card at any of the relevant merchants; that two of the merchants are gas stations, where Wilson, who does not have a driver's license or own a car, would not do business; and that Wilson was most likely at home during the transactions at issue. (*Id.* ¶¶ 17, 19.)

### C.     Wilson's Diminished Social Security Funds

On October 25, 2005, Wilson's checking account had a negative balance of $988.70 as a result of the alleged unauthorized transactions. (*Id.* ¶ 21.) At that time, Wilson's only source of income was her monthly Social Security payment of $928. (*Id.*) On November 3, 2005, Wilson's Social Security payment was automatically deposited into her checking account; this was the only money deposited into her account in November 2005. (*Id.*) Also in November 2005, Harris Bank charged Wilson $60.70 in overdraft fees by taking this amount from the Social Security funds on deposit. (*Id.*) Wilson claims she suffered the following economic harm from Defendant's denial of her claim that the transactions were unauthorized and the Bank's use of her Social Security benefits to pay overdraft fees: She was required to borrow money to pay her rent, ask others to purchase her food, cancel her telephone service and doctors' appointments, and spend money on cab fare.[4] (*Id.* ¶ 22.)

Wilson filed this six-count complaint against Harris on November 7, 2006. In Count I, the

---

[4]      Wilson has not explained how the denial of her claim forced her to spend money on cab fare.

only count not challenged in this motion, Wilson alleges that Harris Bank's failure to adequately investigate the transactions violated the EFTA's error resolution procedures as set forth in 15 U.S.C. § 1693f and the Act's enacting legislation, 12 C.F.R. § 205.11. (*Id.* ¶¶ 23-27.) Harris has moved to dismiss the remaining counts: Count II alleges that Harris Bank is liable for treble damages under § 1693f of the EFTA because it did not provisionally recredit her bank account while conducting its investigation and did not make a good faith investigation into the allegedly unauthorized transactions. (*Id.* ¶¶ 28-31.) Count III also alleges that Harris Bank is liable for treble damages under § 1693f because the bank failed to recredit Wilson's account and "did not have a reasonable basis for believing that the plaintiff's account was not in error." (*Id.* ¶¶ 32-35.) Count IV alleges that Wilson is entitled to treble damages under § 1693f(e)(2) because Harris Bank "knowingly and willfully decided that the plaintiff's account was not in error" when such a conclusion was not reasonable. (*Id.* ¶¶ 36-38.) Count V alleges that Harris Bank's failure to conduct an adequate investigation into Wilson's claim constituted an "unfair practice" in violation of the ICFA. (*Id.* ¶¶ 39-48.) Finally, Count VI alleges that Harris Bank's use of Wilson's automatically deposited Social Security funds to pay her overdraft fees violated § 407(a) of the Social Security Act. (*Id.* ¶¶ 49-53.)[5] The court discusses Harris Bank's arguments for dismissal below.

## DISCUSSION

To withstand a motion to dismiss, a complaint need not plead specific facts; rather, it "need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, __ U.S. __, 127 S. Ct. 2197, 2200 (2007) (per curiam) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. __, 127 S. Ct. 1955, 1964 (2007)). When ruling on a motion to dismiss for failure to state a claim, the court accepts "as true all of the factual allegations contained in the complaint." *Id.* (citations omitted).

---

[5] Wilson erroneously labeled her claim under the Social Security Act as Count VII but the court will refer to it as Count VI.

## A.    Claims Under the Electronic Funds Transfer Act (Counts II, III, and IV)

Wilson brings Counts II, III and IV under the EFTA.   The EFTA includes a variety of directives from Congress on how financial institutions should handle alleged errors stemming from the electronic transfer of funds.   *See* 15 U.S.C. § 1693f.   Under § 1693f(a), when a consumer notifies a financial institution that the consumer believes his or her account has been debited in error, the "institution shall investigate the alleged error, determine whether an error has occurred, and report or mail the results of such investigation and determination to the consumer within ten business days."   *Id.* § 1693f(a)(3).   If the financial institution determines that an error did occur, it must credit the consumer's account, with interest, within one business day of making that determination. *Id.* § 1693f(b).   If the financial institution is unable to complete its investigation within ten business days after receiving notice of a complaint, it must "provisionally recredit the consumer's account for the amount alleged to be in error, . . ., including interest where applicable, pending the conclusion of its investigation."   *Id.* § 1693f(c).   If, after investigation, the financial institution determines that an error did not occur, "it shall deliver or mail to the consumer an explanation of its findings within [three] business days after the conclusion of its investigation, and upon request of the consumer promptly deliver or mail to the consumer reproductions of all documents which the financial institution relied on to conclude that such error did not occur."   *Id.* § 1693f(d).

The Act provides for an award of treble damages for certain violations of these provisions. Treble damages are available if the institution fails to provisionally recredit a consumer's account when the investigation took longer than ten business days, and the institution: (A) "did not make a good faith investigation of the alleged error, or (B) did not have a reasonable basis for believing that the consumer's account was not in error."   *Id.* § 1693f(e)(1).   Treble damages are also available to a consumer when the financial institution "knowingly and willfully conclude[s] that the consumer's account was not in error when such conclusion could not reasonably have been drawn from the

evidence available to the financial institution at the time of its investigation." *Id.* § 1693f(e)(2).

### 1. Counts II & III

Harris Bank has moved to dismiss Counts II and III. In both counts, Wilson alleges that she is entitled to treble damages under § 1693f(e)(1) because the Bank did not "provisionally recredit the plaintiff's checking account within the ten-day period specified" in § 1693f(c), and did not: (1) "make a good faith investigation into the unauthorized transactions" (Count II), or (2) "have a reasonable basis for believing that the plaintiff's account was not in error" (Count III). Harris Bank argues that these claims are based on the faulty premise that the Bank was required to provisionally recredit Wilson's account, a finding that is necessary to an award of treble damages under § 1693f(e)(1). (Def. Mot. ¶ 16.) According to the Bank, it notified Wilson of the results of its investigation within the required time frame and therefore cannot be held liable for treble damages under § 1693f(e)(1). (*Id.* ¶ 15.) Wilson asserts, in response, that because Harris Bank's determination was made after the ten-day deadline set forth in § 1693f(a), the Bank was required to provisionally recredit her account. (Plaintiff's Response to Defendant's Motion to Dismiss Pursuant to Rule 12(b)(6) ("Pl. Resp.") at 2.)

The parties agree that Wilson brought her claim to the Bank's attention on October 13, 2005, and was advised that her claim was denied in an October 28, 2005 letter. According to Wilson, the fact that the notice was issued eleven business days after she notified the Bank of the alleged unauthorized transactions is sufficient to establish that the Bank's investigation was not timely under § 1693f(a) and that the Bank was therefore required to provisionally recredit her account. (Pl. Resp. at 2-3.) Harris Bank contends that the EFTA's provisions are ambiguous: Section 1693f(a) can be read to require that both the investigation and notice of results be completed within ten business days, while § 1693f(d) appears to allow a full ten-day period for the financial institution to investigate the claim, followed by notice to the consumer of its determination "within three business days after the conclusion of its investigation." (Harris N.A.'s Reply in Support

of its Motion to Dismiss Pursuant to Rule 12(b)(6) ("Def. Reply") at 3-4.) The EFTA's implementing regulation, 12 C.F.R. § 205.11(c)(1), adopts the more generous schedule. It states that the institution must determine whether an error occurred within ten business days and report the results to the consumer "within three business days after completing the investigation." Thus, Harris Bank argues, its notification to Wilson, eleven business days after she submitted her complaint, complies with § 1693f(d) and the EFTA's implementing regulation. (Def. Reply at 3-4.)[6]

The court agrees with the Bank that the language of § 1693f(a) and § 1693f(d) generate some uncertainty concerning the timeline for investigation and notification that financial institutions must follow in order to avoid the obligation of recrediting the consumer's account. In such circumstances, the court can seek clarification in the relevant agency's interpretation of the statute. *See Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837, 844 (1984) (collecting cases) ("We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations.") If the statute is ambiguous, as is the case here, the court will defer to the agency's interpretation as long as the regulation the agency has promulgated is a reasonable reading of the statute. *Bankers Life & Cas. Co. v. United States*, 142 F.3d 973, 983 (7th Cir. 1998) (describing the two-step analysis involved in *Chevron*-deference: first, the court must examine the text of the statute to see if the plain meaning of the statue supports or opposes the regulation, and, second, if the statute is ambiguous, the court examines the reasonableness of the regulation, granting deference to agency interpretations that are reasonable).

As explained above, 12 C.F.R. § 205.11(c)(1) states that a "financial institution shall investigate promptly and . . . shall determine whether an error occurred within ten business days

_____

[6]    In Harris Bank's reply, the Bank quotes language from § 1693f(d) but cites to § 1693f(c). The court assumes the Bank intended to cite to § 1693f(d).

of receiving a notice error," and the "institution shall report the results to the consumer within three business days after completing its investigation." Because this language is consistent with one of the two statutory provisions, § 1693f(d), the court concludes that the agency interpretation is reasonable. The court will therefore measure the Bank's response to Wilson's claim under the ten days/three days schedule set forth in the regulation. Wilson insists that the Bank failed to comply even with this more generous interpretation of its obligations: She presented her claim on October 13, and the Bank sent notice that her claim was denied on October 28. Although that notice came on the eleventh business day after she presented her claim, Wilson argues, the Bank has not demonstrated that it actually completed the investigation within the ten-day period allowed for the investigation. (Pl. Resp. at 3.)

The court acknowledges the possibility that the Bank did not in fact complete its investigation within ten days. The Bank could have completed its investigation on the same day that it notified Plaintiff of the denial—October 28, eleven business days after receiving her claim. The court acknowledges, further, that dismissal of the complaint on motion is appropriate only if no set of facts consistent with the allegations would support a claim for relief. The court is nevertheless reluctant to adopt Plaintiff's theory that, even without a specific allegation of wrongdoing, the Bank has an obligation, at the pleading stage, to present affirmative evidence of its compliance with the regulation. Wilson's complaint does not allege that the Bank's investigation was not timely, nor has she even asserted that the Bank *completed* its investigation on the eleventh day. Without such allegations, the complaint does not give Harris Bank fair notice of the grounds on which Wilson's claims for treble damages in Counts II and III rest. The Bank's motion to dismiss Counts II and III is granted.

### 2.    Count IV

Count IV of Wilson's complaint alleges that Wilson is entitled to treble damages under

15 U.S.C. § 1693f(e)(2) because Harris Bank "knowingly and willfully decided that the plaintiff's account was not in error when such a conclusion could not reasonably have been drawn from the evidence available to Harris Bank at the time of its investigation." (Compl. ¶ 37.) Harris Bank has moved to dismiss this claim, stating only that the complaint "provides no basis suggesting that Harris engaged in any knowing or willful misconduct." (Def. Mot. ¶ 17.) Wilson points out, correctly, that § 1693f(e)(2) does not require her to plead that Harris Bank engaged in "knowing and willful misconduct" as the Bank contends. (Pl. Resp. at 4.) Rather, § 1693f(e)(2) requires only that the Bank "knowingly and willfully *concluded* that the consumer's account was not in error when such conclusion could not reasonably have been drawn from the evidence *available to the institution at the time of its investigation*." 15 U.S.C. § 1693f(e)(2) (emphasis added).[7] The court concludes Wilson's allegations are sufficient in this regard.

Wilson alleges, based on the Bank's explanation for the denial of her claim, that it did not investigate her past ATM use, review security footage of the transaction points, or look into Wilson's whereabouts at the time of the transactions. (Compl. ¶¶ 17-19.) It is reasonable to assume that such evidence would have been available to the Bank at the time of its investigation. Moreover, Wilson alleges that had the Bank undertaken such inquiries, it would have discovered facts at odds with its conclusions: Wilson is eighty years old and wheelchair bound; she has never used her debit card at any of the relevant merchants or, indeed, for any consumer purchases of the type at issue here; she does not do business at gas stations; and she was most likely at home during the transactions at issue. (*Id.*) When construed in Wilson's favor, these allegations are sufficient to

---

[7]     In Plaintiff's brief, she states in passing that § 1693f(e)(2) requires that a financial institution provisionally recredit a consumer's account within the ten-day period after the institution receives notice of the consumer's complaint. Plaintiff did not make such allegations in her complaint, however, and under the court's reading of the plain language of § 1693f(e), only § 1693f(e)(1)—not § 1693f(e)(2)—requires that the financial institution provisionally recredit a consumer's account within the specified period. Thus, the court will not discuss the Bank's failure to provisionally recredit Plaintiff's account in connection with Count IV.

establish, for the purpose of this motion to dismiss, that it was unreasonable for the Bank to have concluded that her account was in error. Because Wilson also alleged that the Bank "knowingly and wilfully decided that the plaintiff's account was not in error . . . ," (Compl. ¶ 37), the court concludes that Wilson has stated a claim in Count IV.

## C.    Claim under the Illinois Consumer Fraud and Deceptive Practices Act (Count V)

Count V alleges a violation of the ICFA. (Compl. ¶¶ 39-48.) According to the complaint, Harris Bank's failure to conduct an adequate investigation into the alleged unauthorized transactions constitutes an unfair practice that violates the ICFA and "offends public policy, is immoral, unethical, oppressive and unscrupulous, and substantially harms consumers." (*Id.* ¶¶ 44-45.) Wilson further alleges in Count V that the Bank's conduct was "willful, wanton and in reckless disregard of the rights of others," entitling her to punitive damages. (*Id.* ¶ 48.) Harris Bank has moved to dismiss this count, arguing that claims under the ICFA must be stated with factual particularity and that Wilson does not allege any specific facts to support that the Bank engaged in an unfair practice under the ICFA or that the Bank's conduct was "willful, wanton and in reckless disregard of the rights of others." (Def. Mot. ¶¶ 21-22.)

In order to state claim under the ICFA, a plaintiff must allege: "(1) a deceptive act or practice by defendant; (2) defendant's intent that plaintiff rely on the deception; and (3) that the deception occurred in the course of conduct involving trade and commerce." *Connick v. Suzuki Motor Co., Ltd.*, 174 Ill. 2d 482, 501, 675 N.E.2d 584, 593 (1996) (citing *Siegel v. Levy Org. Dev. Co.*, 153 Ill. 2d 534, 542, 607 N.E.2d 194 (1992)). A plaintiff may allege conduct that is unfair but not deceptive. *See Saunders v. Mich. Ave. Nat'l Bank*, 278 Ill. App. 3d 307, 313, 662 N.E.2d 602, 608 (1st Dist. 1996).

The court first considers the adequacy of Plaintiff's ICFA allegations. Harris contends that

claims under the ICFA must be stated with "factual particularity and specificity," and Wilson does not argue otherwise. (Def. Mot. ¶ 20.)[8]  The alleged unfair practice here is the Bank's investigation of her complaint of unauthorized withdrawals from Wilson's checking account. (Compl. ¶ 44 ("Defendant's failure to conduct an adequate investigation into plaintiff's claim is an unfair practice in violation of the Illinois Consumer Fraud Act").)   The court concludes that Wilson's allegations concerning this practice are sufficiently specific: Her complaint identifies the alleged unauthorized transactions; explains when and how she informed the Bank of her claim; sets forth her subsequent communications with the Bank regarding the alleged unauthorized transactions and the content of those communications; and notes the actions the Bank declined to take in its investigation of the alleged unauthorized transactions.  (*Id.* ¶¶ 8-13, 17-19.)

The court is, therefore, satisfied that Wilson has pleaded the circumstances surrounding the Bank's alleged unfair practice with sufficient particularity.  The Banks has also suggested, however, that Wilson's allegations are insufficient because she has not specifically asserted that the Bank engaged in a deceptive or unfair practice.  To determine whether an act is unfair within the meaning of the ICFA, courts consider: "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes a substantial injury to consumers."  *Robinson v. Toyota Motor Credit Corp.,* 201 Ill. 2d 402, 417, 775 N.E.2d 951, 961 (2002) (citing *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n.5 (1972)).  A plaintiff need not assert that all three of these factors are met.  "'A practice may be unfair because of the degree to

---

[8]        At least some authority suggests that when a claim under the ICFA is based on an unfair practice, rather than a deceptive one, there is no heightened pleading requirement.  *See Strohmaier v. Yemm Chevrolet*, 211 F. Supp. 2d 1036, 1043 (N.D. Ill. 2001) ("[S]ome claims that arise under the ICFA may not be fraud claims and may fall outside the scope of Rule 9(b)"); *Gaddy v. Galarza Motor Sport L.T.D*, No. 00 C 3893, 2000 WL 1364451, *4 (N.D. Ill. Sept. 20, 2000) (citation omitted) (Rule 9(b)'s pleading standards "inapplicable" because the ICFA "prohibits not only fraud, but a broad array of unfair practices").  Because, as discussed in the text, Wilson's allegations meet a heightened pleading standard, the court need not consider whether such a standard is necessarily imposed here.

which it meets one of the criteria or because to a lesser extent it meets all three.'" *Robinson*, 201 Ill. 2d at 418, 775 N.E.2d at 961 (quoting *Cheshire Mortg. Serv., Inc. v. Montes*, 223 Conn. 80, 106, 612 A.2d 1130, 1143 (1992)).

The court concludes Wilson's allegations are adequate in this regard, as well. In making this determination, the court considers whether the Bank's alleged practices offend public policy as reflected in "statutes, the common law, or otherwise—whether, in other words, [the challenged conduct] is within at least the penumbra of some common-law statutory, or other established concept of unfairness." *Sperry & Hutchinson Co.*, 405 U.S. at 244 n.5; *see also Griffin v. Universal Cas. Co.*, 274 Ill. App. 3d 1056, 1069, 654 N.E.2d 694, 703 (1st. Dist. 1995) (citations omitted) (applying standard set forth in *Sperry & Hutchinson Co.*). Though the relevant public policy in this case has not been formally established by statute or common law, Wilson has alleged that the Bank's investigation of her claim failed to meet the standards of fairness set forth in the OCC's advisory letter. That letter, issued to financial institutions on September 7, 2001, addressed precisely the circumstances that Wilson claims are at issue here: a customer complaint of unauthorized transactions where the customer's debit card and personal identification number were used in the transaction and the customer supplied no information to indicate that her card or identification number were misappropriated. (Compl. ¶¶ 14-15.) Indeed, the letter specifically instructs that "banks cannot assume that they have satisfied their duty to investigate simply by concluding that the customer's debit card and PIN were used in the transaction at issue." Yet, according to Wilson's allegations, the Bank made this precise assumption when it denied her claim. (OCC Advisory Letter; Compl. ¶ 13.) And, although the court does not read the advisory letter to require the Bank to take every one of the recommended investigative steps, Wilson has alleged that the Bank in fact took none of the actions counseled by the OCC's letter. (OCC Advisory Letter; Compl. ¶¶ 17-19.)

The court concludes Wilson's allegations also satisfy the remaining two bases for concluding that a practice is "unfair" within the meaning of ICFA—a showing that the practice at issue is "immoral, unethical, oppressive or unscrupulous" or that it "causes a substantial injury to consumers." *Robinson*, 201 Ill. 2d at 417, 775 N.E.2d at 961 (citation omitted). Wilson's allegations are sufficient to raise an inference that the Bank's conduct was oppressive. According to the complaint, without conducting any significant investigation, and despite the availability of evidence that strongly suggests the transactions were unauthorized, the Bank rejected Wilson's claim and failed to provide any explanation of the reasons for the denial for six months. (Compl. ¶¶ 11-13, 17-19.) The complaint also sufficiently alleges a substantial injury to consumers. "A practice causes substantial injury to consumers if it causes significant harm to the plaintiff and has the potential to cause injury to a large number of consumers." *Garrett v. RentGrow, Inc.*, No. 04 C 8309, 2005 WL 1563162, *4 (N.D. Ill. July 1, 2005) (citation omitted). Wilson asserts that that she was deprived of her only source of income for more than a month as a result of the Bank's conduct. (Compl. ¶ 47.) Given that Harris Bank is alleged to have more than two hundred branches in the Chicagoland area and northwest Indiana, (*id.* ¶ 4), the court can reasonably infer that its large consumer base may be at risk of being subjected to cursory and inadequate investigations of claims of unauthorized transactions.

Finally, Harris Bank contends that it cannot be liable for punitive damages because "Plaintiff fails to allege any particular or specific facts suggesting that Harris engaged in conduct that was 'willful, wanton and in reckless disregard of the rights of others' that would allow for the imposition of punitive damages in this case." (Def. Mot. ¶ 23.) In making this argument, Harris Bank ignores a number of Wilson's allegations. Wilson has specifically alleged that the Bank's conduct was "willful, wanton and in reckless disregard of the rights of others," (Compl. ¶ 48), and has identified investigative steps the Bank failed to take and circumstances the Bank refused or failed to consider. (*See id.* ¶¶ 17-19.) Construing these allegations in Wilson's favor, as required at this stage, the

14

court concludes the complaint supports an inference that the Bank acted willfully or wantonly. Harris Bank's motion to dismiss is denied as to Count V.

### D.     Count VI

In the final count of her complaint, Wilson claims that Harris Bank violated § 407(a) of the Social Security Act when it used $60.70 in social security funds that had been deposited directly into her checking account to pay overdraft fees resulting from the alleged unauthorized transactions.  (*Id.* ¶¶ 21, 50-53.)  Wilson alleges that the Bank's conduct "constitutes an illegal assignment and/or transfer in violation of Section 407(a) of the Social Security Act," (*id.* ¶ 51), and that "Harris Bank's taking of plaintiff's social security benefits constitutes 'other legal process' and is thus prohibited by" § 407(a).  (*Id.* ¶ 52.)  Harris Bank has moved to dismiss Count VI, arguing that the Bank's use of funds that had Social Security benefits as their source does not constitute "other legal process" within the meaning of § 407(a).  (Def. Mot. ¶¶ 27-28.)

In relevant part, § 407(a) states that the "right of any person to any future payment under this subchapter shall not be transferable or assignable, at law or in equity, and none of the moneys paid or payable or rights existing under this subchapter shall be subject to . . . other legal process." 42 U.S.C. § 407(a).  Wilson urges that this provision identifies two different restrictions on the use of Social Security benefits.  *See Wash. State Dep't of Social and Health Servs. v. Keffeler*, 537 U.S. 371, 383 n.6 (considering party's argument that benefits were improperly assigned under § 407(a) separately from the party's argument that benefits were taken by "other legal process" under § 407(a)).  The court addresses, in turn, Wilson's claims that the Bank violated those restrictions.

### 1.     Transfer of the Right of Future Payment

Wilson argues, first, that the Bank's conduct resulted in the improper transfer of a recipient's right to future Social Security payments in violation of the first clause of § 407(a).  Because the court considers the first part of § 407(a) to be unambiguous—notably, the parties do not argue

15

otherwise—the court will give effect to its plain language. *See United States v. Ranum*, 96 F.3d 1020, 1029 (7th Cir. 1996) (court must give effect to plain meaning of clear and unambiguous statutes) (citation omitted). The words of the statute are clear: the prohibition on the transfer or assignment of Social Security benefits applies to "any future payment under [the] subchapter." 42 U.S.C. § 407(a). Naturally, the Bank could not have used the Social Security funds at issue to pay Wilson's overdraft fees until after they were deposited into her checking account. Wilson does not allege otherwise. Thus, the court concludes that the Bank's conduct did not amount to an illegal assignment or transfer of *future* Social Security payments.

The cases cited by Wilson do not persuade the court that the Bank violates § 407 by collecting an overdraft fee from funds on deposit, whenever those funds originated from a monthly Social Security payment. The cases Wilson cites in support of this theory, *Hambrick v. First Security Bank*, 336 F. Supp. 2d 890 (E.D. Ark. 2004) and *In re Brewer*, No. 02-32068, 2002 WL 32917680 (Bankr. S.D. Ill. Aug. 15, 2002) are not binding and are arguably distinguishable. The plaintiff in *Hambrick* alleged a violation of § 407(a)'s anti-assignment provision when the defendant credit union used Social Security funds that were directly deposited into the plaintiff's closed bank account to offset the unpaid portion of a $ 37,600 promissory note and to pay a $ 405.40 account overdraft. *Id.* Denying the credit union's motion for summary judgment, the *Hambrick* court concluded that an "agreement, even one voluntarily entered into by Hambrick, that transferred or assigned his rights to future payment of Social Security benefits to First Security Bank to offset debts owed would violate § 407." *Id.* 893-94. The court is uncertain whether any similar agreement exists in this case: in her response brief, Wilson states that Harris Bank "presumably" appropriated her funds pursuant to a banking agreement, but acknowledged that she is not in possession of any banking agreement. (Pl. Resp. at 12 & n.3.) In any event, Harris Bank has not suggested it is entitled to use funds deposited in Wilson's account as payment against an independent debt. And the *Hambrick* court expressed uncertainty about whether a financial institution's use of Social

Security funds from a consumer's account pursuant to an account agreement would be improper in all cases. 336 F. Supp. 2d at 894 (suggesting there might be a "valid, effective contractual right" to set-off against an existing account).

*Brewer* is similarly distinguishable. *Brewer* addressed a credit union's use of the plaintiffs' Social Security funds, which were automatically deposited into their credit union account, to pay their credit card debt and car loans. 2002 WL 32917680, at *1. Similar to *Hambrick*, the court disapproved of such a prior agreement for payment out of Social Security deposits against independent debt. *Id.* at *4. Notably, other courts have concluded that § 407 does not prohibit a bank from using Social Security funds to pay overdraft fees pursuant to a voluntarily-entered account agreement. *See, e.g.*, *Lopez v. Wash. Mut. Bank*, 302 F.3d 900 (9th Cir. 2002) (noting that the plaintiffs "voluntarily opened an account with the bank and executed an account holder agreement which outlined the terms and conditions of the bank's overdraft policies," and concluding that "each deposit to the account after an overdraft should [therefore] be treated as a voluntary payment of a debt incurred"). The court concludes that Wilson has not stated a violation of the first prong of § 407(a).

### 2.      Funds Subject to Other Legal Process

Nor has Wilson stated a claim for a violation of the other prohibition of § 407(a), which provides, in relevant part, that "none of the moneys paid or payable or rights existing under this subchapter shall be subject to . . . other legal process." Wilson's claim that the Bank's use of her Social Security funds to pay the overdraft fee involves "other legal process" is defeated by the Supreme Court's holding in *Keffeler*. In that case, the Court held that the state's use of the Social Security funds of foster children in order to reimburse the state for expenditures in connection with the foster children's care did not involve "other legal process" under § 407(a). *Id.* at 375. The Court construed "legal process" narrowly and explained that it should be understood

much like the processes of execution, levy, attachment, and garnishment and, at a minimum, would seem to require utilization of some judicial or quasi-judicial mechanism, though not necessarily an elaborate one, by which control over property passes from one person to another in order to discharge or secure discharge of an allegedly existing or anticipated liability.

*Id.* at 385. The Court also emphasized that legal processes "typically involve the exercise of some judicial or quasi-judicial authority to gain control of another's property." *Id.* at 386.

Wilson argues that in collecting an overdraft fee from her account, the Bank was aiming to discharge what could be characterized as an enforceable obligation. But, under *Keffeler*, the presence of an enforceable claim is not enough to establish that "other legal process" was involved in the appropriation of funds whose source is a Social Security payment. The Bank's use of Wilson's funds must also have involved a judicial or quasi-judicial mechanism. The court concludes that it did not.

According to Wilson, the Bank's action "was quasi-judicial in nature because, in deciding that it could use Plaintiff's social security benefits to pay its overdraft charges, Harris unilaterally decided an issue that a court could have decided"—whether the Bank "could setoff Plaintiff's benefits pursuant to agreement or common law." (Pl. Resp. at 14.) In the court's view, Wilson's view of a quasi-judicial mechanism is overly broad. Naturally, a quasi-judicial process is one that is like or similar to a judicial or adjudicative process. For example, non-judicial officials can be granted judicial immunity for "quasi-judicial conduct" when their duties "have an integral relationship with the judicial process." *Henry v. Farmer City State Bank*, 808 F.2d 1228, 1238 (7th Cir. 1986) (citation omitted).[9] In this case, the court cannot conclude that the Bank's withdrawal of funds already in Wilson's account to pay an overdraft fee resembles a judicial action. It is reasonable to

---

[9] Wilson cites *Washington Federation of State Employees v. State Personnel Board*, 23 Wash. App. 142, 145-46, 594 P.2d 1375, 1378 (Wash. App. Div. 2 1979)*,* which sets forth factors to determine whether an agency's actions are quasi-judicial. (Pl. Resp. at 14.) While administrative agencies routinely perform quasi-judicial functions, Wilson does not argue and cites no cases to explain why this court should find a financial institution's imposition of an overdraft fee to be similar to the quasi-judicial conduct of administrative agencies.

assume that a consumer incurs an overdraft fee each time the withdrawals to an account exceed its balance; there is nothing adjudicative about such a process.  If the court were to consider this process to be quasi-judicial in nature, it would effectively preclude banks from charging any fees—overdraft or otherwise—against any consumer whose account may include deposits from Social Security payments.  The court declines to construe the term "quasi-judicial" so expansively.

Wilson attempts to characterize the overdraft fee as a "setoff" and cites pre-*Keffeler* cases concluding that a bank setoff constitutes "other legal process."  (Pl. Resp. at 14-15.)  The court does not find these cases persuasive.  In both *Tom v. First American Credit Union*, 151 F.3d 1289, 1291 (10th Cir. 1998) and *Marengo v. First Massachusetts Bank*, 152 F. Supp. 2d 92, 93 (D. Mass. 2001), (as in *Hambrick* and *Brewer*), the banks used consumers' Social Security funds to satisfy separate pre-existing debts not related to the consumers' checking accounts.  Such facts are dissimilar to this case where an overdraft fee was withdrawn from the overdrawn checking account itself.  *Lopez* presented the latter situation and distinguished *Tom* on the same basis.  302 F.3d at 906.  In *Lopez*, the court concluded that the defendant's practice of using the plaintiffs' direct Social Security deposits to pay account overdrafts and overdraft fees did not violate § 407(a).  *Id.* at 904.  This court adopts that conclusion, as well.

Because Wilson has not sufficiently alleged an illegal transfer or assignment of further Social Security payments or that the Bank's appropriation of her funds involved "other legal process," Harris Bank's Motion to Dismiss is granted as to Count VI.

## CONCLUSION

For the reasons discussed above, Harris Bank's motion to dismiss (17) is granted as to Counts II, III, and VI, and denied as to Counts IV and V.  Plaintiff has leave to file an amended complaint, if any, on or before September 26, 2007.

ENTER:

Dated: September 4, 2007

                                           _____
                                           REBECCA R. PALLMEYER
                                           United States District Judge